**OWNER–OPERATOR INDEPENDENT DRIVERS ASSOCIATION, et al., Plaintiffs,**

v.

**C.R. ENGLAND, INC., Defendant.**

**No. 2:02–CV–950 TS.**

United States District Court, D. Utah, Central Division.

July 13, 2004.

for an accommodation.

---

**6.** E.g. plaintiff states in her Affidavit to the UALD that she was terminated after asking

Brent O. Hatch, Hatch James & Dodge, Salt Lake City, UT, Daniel R. Unumb, Paul D. Cullen, Sr., Belinda L. Harrison, Joyce E. Mayers, David A. Cohen, Paul D. Cullen, Jr., The Cullen Law Firm PLLC, Washington, DC, for Plaintiffs.

Robert L. Stevens, George T. Naegle, Richards Brandt Miller & Nelson, Nelson L. Hayes, James S. Jardine, N. Aaron Murdock, Ray Quinney & Nebeker, Salt Lake City, UT, Robert L. Browning, Jeffrey S. Toole, Scopelitis Garvin Light & Hanson, Indianapolis, IN, Daniel R. Barney, Scopelitis Garvin Light & Hanson, Washington, DC, for Defendant.

## MEMORANDUM DECISION AND ORDER ON ALL PENDING MOTIONS

STEWART, District Judge.

## I. INTRODUCTION

Plaintiffs are independent truck drivers, known as Owner–Operators, who filed this action in federal court in California alleging that the defendant motor carrier, C.R. England, failed to comply with the federal leasing regulations governing leases of equipment and drivers in interstate trucking—namely the Truth–in–Leasing Regulations found at 49 C.F.R. Part 376. On C.R. England's motion, venue was transferred to this district. C.R. England seeks to stay this case and compel arbitration or, in the alternative, to dismiss for the failure to state a claim. Plaintiffs seek partial summary judgment that they are not required to arbitrate their claims.

The court finds that arbitration of Plaintiffs' claims is not required on several grounds, including the following: the Operating Agreements are "contracts of employment" of transportation workers within the meaning of the FAA, and the arbitration provisions of the Operating Agreements are unenforceable as unconscionable where, among other factors, C.R. England has never taken a single one of its own 2,591 claims against its drivers to arbitration. The court further finds that Plaintiffs do have a private cause of action under the Truth–in–Leasing Regulations, that a four-year statute of limitations applies to those claims, that an administrative order is not a prerequisite for filing and that referral to an administrative agency is not appropriate. Accordingly, the court will deny C.R. England's Motion to Stay and Compel Arbitration and its Motion to Dismiss and this case will proceed to discovery and trial.

## II. PENDING MOTIONS

C.R. England moves to stay this case and compel arbitration of Plaintiffs' claims pursuant to the arbitration clause in its Independent Contractor Operating Agreement. (Defendant's Motion to Stay and Compel Arbitration). Plaintiffs oppose ar-

bitration and move for partial summary judgment on the arbitration clause arguing that it does not apply. (Plaintiffs' Motion for Partial Summary Judgment as to Arbitration).

C.R. England also moves to dismiss this case on the basis that (1) the federal regulations at issue do not provide Plaintiffs a private cause of action; (2) Plaintiffs did not obtain what C.R. England contends is a necessary administrative order from the Secretary of the Department of Transportation prior to filing this action; and (3) the Complaint is barred by the statute of limitations. In the alternative, C.R. England seeks to stay this action to obtain a ruling by the Federal Motor Carrier Safety Administration, FMCSA, on the appropriate legal standard. (Defendant's Motion to Stay Argument and Decision on Defendant's Motion to Dismiss).

C.R. England also filed a Motion to Stay Argument and Decision on its Motion to Dismiss until after the arbitration issue is decided. (Defendant's Motion to Stay Argument and Decision on Defendant's Motion to Dismiss).

### III. ARBITRATION

#### A. Parties' Positions

C.R. England contends that the arbitration clauses of its Independent Contractor Operating Agreement (Operating Agreements) require mandatory arbitration. The Operating Agreements, or leases as they are commonly called, provide for the lease of the equipment and a driver, usually the owner-operator, to C.R. England for the purpose of transporting and loading and unloading freight. Ex. A at ¶ 1. The Operating Agreements contain the following arbitration clauses:

> To the extent any disputes arise under this Agreement or its interpretation, You and We agree to submit such disputes to final and binding arbitration under the rules of the American Arbitra-

tion Association before an arbitrator You and We agree at a point agreed upon or Salt Lake City, UT. Nothing in this provision shall preclude WE from taking whatever legal action WE deem necessary to regain possession of any cargo of Our customers or Our trailer if YOU default under this Agreement.

Complaint, Ex. A at ¶ 16.

> To the extent any disputes arise under this Agreement or its interpretation, WE both agree to submit such disputes to final and binding arbitration under the rules of the American Arbitration Association before an arbitrator WE and You agree at a point agreed upon or Salt Lake City, UT. Nothing in this provision shall preclude WE from taking whatever legal action WE deem necessary to regain possession of any cargo of Our customers or Our trailer if YOU default under this Agreement.

Complaint, Ex. B at ¶ 16.

Plaintiffs oppose C.R. England's motion to compel arbitration on the following grounds: Plaintiffs argue that their claims are exempt from compulsory arbitration pursuant to Section 1 of the Federal Arbitration Act (FAA) which excludes from its coverage "contracts of employment ... of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiffs further contend that the arbitration clauses at issue, which apply only to any "disputes [that] arise under this Agreement or its interpretation," do not include Plaintiffs' federal statutory claims. Plaintiffs also argue that they cannot be compelled to arbitrate these claims because the arbitral forum does not provide an effective and accessible means for them to vindicate their federal statutory rights. Finally, Plaintiffs assert that the arbitration clause should not be enforced because it is unconscionable under state law.

B. FAA Exemption of Employment Contracts for Transportation Workers

■ The Court has reviewed all of the materials and the cases cited and is mindful of the rule under the FAA, that any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration:

Under the FAA, a "court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *McMahan Sec. Co. v. Forum Capital Markets,* 35 F.3d 82, 85 (2d Cir.1994) (citing 9 U.S.C. § 3). " '[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration,' and thus, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " *Armijo v. Prudential of America,* 72 F.3d 793, 797 (10th Cir.1995) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

*Williams v. Imhoff,* 203 F.3d 758, 764 (10th Cir.2000). *See also Moses Cone Mem. Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitration issues should be resolved in favor of arbitration whether the issue is the construction of the contract language itself" or a defense to arbitrability).

However, § 1 of the FAA also provides that the FAA does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate commerce." 9 U.S.C. § 1. No matter how C.R. England may characterize this exemption, the Court cannot deem it to be anything other than an express exemption from the general policy favoring arbitration under the FAA.

The Supreme Court has clarified that this FAA exemption applies only to workers actually engaged in the movement of goods in interstate commerce, in other words, to contracts of employment for transportation workers. *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). It is clear that Plaintiffs, as persons who, pursuant to the Operating Agreements at issue, actually move items in interstate commerce, are in a class of workers engaged in interstate commerce, or are transportation workers, within the meaning of the exemption.

As recognized by the parties, there is a split of authority on the scope of this section's exemption. C.R. England urges the Court to follow the position adopted in *Owner–Operator Indep. Drivers Ass'n v. Swift Transp. Co. Inc.,* 288 F.Supp.2d 1033 (D.Ariz.2003). *Swift* held that the exemption does not apply to owner-operators who were independent contractors. The other side of the split is represented by two cases from the Middle District of Florida, *Gagnon v. Service Trucking,* 266 F.Supp.2d 1361 (M.D.Fla.2003) and *Owner–Operator Indep. Drivers Ass'n v. Landstar System, Inc.,* Case No. 3:02–CV–1005 (M.D.Fla. Sept. 30, 2003).

The Court notes that *Gagnon* relies partly on the statutory employer-employee theory developed in connection with tort liability of the interstate carriers for personal injuries sustained as a result of the actions of the drivers of tractors which are, as in this case, leased to the carrier. This theory is followed in the Tenth Circuit in *Rodriguez v. Ager,* 705 F.2d 1229 (10th Cir.1983), and is adopted in the regulations dealing with motor carrier safety at 49 C.F.R. parts 200 through 399.

However, the regulations and case law involving statutory employer-employee are not applicable to the present situation, which does not involve liability for personal injuries. The regulation applicable to the present case, 49 C.F.R. § 376.12(c)(4), provides that compliance with the regulation does not affect the issue of whether the lessor or driver is an employee or independent contractor.

Unlike the Plaintiffs in the *Gagnon* and *Landstar* cases, Plaintiffs herein do not also contend that they are employees under the common law. Instead, Plaintiffs contend that they are transportation workers who are exempt from compulsory arbitration under § 1 of the FAA. The issue, however, is whether the Operating Agreements involved are within the scope of the exemption. For the purposes of § 1 of the FAA, it is not dispositive that Plaintiffs are categorized in the Operating Agreements as employees or independent contractors. Instead, the Court considers the Operating Agreements to determine whether or not they are "contracts of employment" of a class of workers engaged in interstate commerce within the meaning of the FAA. *Gagnon*, 266 F.Supp.2d at 1364. Thus, the boiler plate language of the Operating Agreements, stating that the relationship is that of "carrier and independent contractor and not as employer-employee," Ex. A at ¶ 8,[1] does not control on this issue.

The court finds that the Operating Agreements at issue in this case are "contracts of employment" within the meaning of the FAA. The Operating Agreements cover the owner-operator's agreement to perform personally, or through other drivers, certain functions related to the operation of the equipment for C.R. England's business, namely to operate the equipment together with all necessary drivers and labor to transport freight on the company's behalf. Complaint, Ex. A at ¶ 1. As such, this court finds they are contracts of employment of transportation workers and are exempt from compulsory arbitration under the FAA.

### C. Arbitration under UAA

■ C.R. England contends that even if the exemption under FAA § 1 applies, the disputes must be arbitrated under the Utah Arbitration Act (UAA). Utah Code Ann. §§ 78–a–101 through 131.

■ Utah law also has a strong policy favoring enforcement of agreements to arbitrate. *See McCoy v. Blue Cross Blue Shield of Utah*, 20 P.3d 901, 904 (Utah 2001)("Where the evidence relating to a purported agreement to arbitrate is undisputed, the district court has no discretion under the statute. It must compel arbitration."); Utah Code Ann. § 78–31a–4(1)("The court, upon motion of any party showing the existence of an arbitration agreement, shall order the parties to arbitrate.").

When it announced its ruling on the non-applicability of the UAA at the close of the hearing, this court followed the reasoning expressed in the unpublished case, *Palcko v. Airborne Express, Inc.*, 2003 WL 21077048 (E.D.Pa.2003). This court found persuasive that court's holding that the exempt status of employees under the FAA preempted the enforcement of an arbitration agreement under state law. Accordingly, the court rejected the contrary ruling found in the case of *Valdes v. Swift Transp. Co.*, 292 F.Supp.2d 524 (S.D.N.Y.2003).

In rejecting *Valdes* this court noted that, unlike *Valdes*, this case does not involve a

---

1. Where the language of the paragraphs in Exhibits A and B are identical, the court will cite only to Exhibit A.

claim based on state law. In *Valdes*, the plaintiff brought a mix of federal and state law claims. *Id.* at 526.

Since that bench ruling, and prior to the issuance of this written ruling, *Palcko* was reversed by the Third Circuit. *Palcko v. Airborne Express, Inc.*, 372 F.3d 588 (3d Cir.2004)(exempt status of employee under FAA does not preempt enforcement of arbitration agreement under Washington state law). The court notes that the arbitration clause in the employment contract at issue in *Palcko,* unlike the Operating Agreements at issue in this case, clearly informed the employee that the state's arbitration action would be applied if the FAA were found to be inapplicable. *Id.* at *1 ("to the extent that the Federal Arbitration Act is inapplicable, Washington [state] law pertaining to agreements to arbitrate shall apply."). Further, *Palcko,* like *Valdes,* involved a mix of federal and state law claims.

The reversal of *Palcko* does not change this court's ruling for two reasons. First, the court continues to rely on its alternative finding, announced at the close of the hearing, that, even if the FAA or the UAA applied, C.R. England has not shown that the arbitration clause at issue covers Plaintiffs' claims in this case. Although the Operating Agreements provide for arbitration "to the extent any disputes arise out of this agreement or its interpretation," that comprehensive language is contradicted by the Operating Agreement's provisions for resolution of many disputes outside of arbitration. For example, the same arbitration clauses contain a broad exception allowing C.R. England to take whatever "legal action" it "deems necessary to regain possession of any cargo of [its] customers or [its] trailer if" the Plaintiff defaults under the Operating Agreement.

The Operating Agreements also allow C.R. England to withhold from amounts otherwise due to Plaintiffs any amounts that it claims it is owed pursuant to the Operating Agreements and their Addenda. Paragraph 2 of the Operating Agreement provides that C.R. England will pay Plaintiffs as indicated in Addendum 2 attached to each Agreement. However, that Addendum provides that C.R. England has discretion at any time to make withdrawals from the Plaintiffs' escrow account at any time to cover any claim by C.R. England that a Plaintiff owes it money. Ex. A, Addendum 2, at ¶ III ("WE, at our discretion, may make withdrawals from the Escrow account at any time ... to cover any indebtedness YOU owe to us."). Paragraph 2 provides that the settlement of the amount due will be final unless "questioned or disputed" by either party within 60 days of the settlement. Thus, C.R. England may exercise a right of setoff or withholding of funds otherwise owed to a Plaintiff before a Plaintiff has the opportunity to contest a settlement, a self-help right inconsistent with requiring that all disputes will be submitted to arbitration. The Operating Agreements further provide:

If YOU have secured an advance of any kind from US, such as for fuel, owe U.S. any money, or request U.S. to withhold money for any reason on Addendum 3, WE shall make deductions from any monies otherwise due YOU. Upon reasonable request WE shall provide documents validating such deductions unless related to a settlement considered final under Paragraph 2 [for the failure to contest by written notice within 60 days].

Ex. A at ¶ 4; Ex. B at ¶ 4. Thus, the right to documentation for C.R. England's unilateral deductions is lost if written notice of a dispute was not given by Plaintiff within the 60 days. The Operating Agreements also provide:

The undersigned agrees that in the event of default in the payment of any amount due and if this account is placed

in the hands of an agency or attorney for collections or legal action, to pay the cost of collection, attorney fees and court costs incurred and permitted by law governing these transactions. A finance charge of ... (18 % annually) will be charged on balances over 30 days past due.

Ex. A & B, at ¶ 15.

These are very broad exceptions to what a reasonable person would consider to be "any dispute arising under the agreement or its interpretation." In view of these broad exceptions, the phrase "any dispute" cannot be understood as covering all disputes between the parties arising under the Operating Agreements or their interpretation. Thus, this case is distinguishable from *Palcko* on the scope of the arbitration agreement.

As noted above, this case is also distinguishable from *Palcko* and *Valdes* because the Complaint herein does not raise a single state law issue. Both of Plaintiffs' causes of action are based on federal statutes and regulations. Complaint, ¶¶ 29 through 35. The arbitration clauses at issue in this case do not inform the Plaintiffs that they cover disputes arising from alleged violations of federal statutes and regulation, including statutory rights under the Truth–in–Leasing Regulations. The Court cannot find that the plain language of the arbitration clause clearly agrees to submit the parties' purely federal claims to arbitration under the Utah Arbitration Act.

Second, the court finds that the enforcement of the arbitration clause would be unconscionable on the undisputed facts of this case. The court will address this issue further below.

### D. Effective and Accessible Forum

#### 1. Contentions of the Parties

■ Plaintiffs contend that the arbitration clause fails to provide an effective and accessible forum to vindicate statutory rights—a requirement for enforcing compulsory arbitration provisions covering rights under federal statutes. *See Gilmer v. Interstate/Johnson Lane Corporation,* 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) ("even claims arising under a statute designed to further important social policies may be arbitrated because, so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum, the statute serves its purpose").

Plaintiffs contend that the arbitration forum fails to provide an effective and accessible forum to vindicate their statutory claims for several reasons, including the relatively small amount of their claims compared to the costs of arbitration. To advance its argument regarding the lack of an effective and accessible forum, Plaintiffs rely on their evidence submitted in support of their Motion for Partial Summary Judgment as to Arbitration. C.R. England contends that it is not required to respond to this evidence because the Plaintiffs should not have filed a motion for summary judgment on the arbitration issue before C.R. England's Motions were resolved.

#### 2. Appropriateness of Motion for Partial Summary Judgment

■ The Court finds that there is nothing improper or premature in Plaintiffs filing their Motion for Partial Summary Judgment on this issue. Their Motion was not premature under the Federal Rules of Civil Procedure. Fed.R.Civ.P. 56(a) (allowing motion for summary judgment 20 days from the commencement of action). The Motion is not inappropriate under the December 20, 2002, scheduling Order which provides that *Plaintiffs* should have

the opportunity to propound and receive discovery responses prior to responding to C.R. England's Motion to Stay and Compel Arbitration and provided other pending motions should proceed according to the local and federal rules. That Order imposed no limitation on the further filing of motions. *See Stein v. Oshinsky*, 348 F.2d 999, 1001 (2d Cir.1965)(Rule 56(a) permits filing of motion for summary judgment while a preanswer Rule 12 motion is pending). C.R. England's own Motion clearly raised the arbitration issue and Plaintiffs responded with actual evidence rather than allegations in support of its position on the arbitral forum. Plaintiffs did so using the summary judgment framework, a procedure that allowed C.R. England full opportunity to submit any contrary evidence and ample time to reply to Plaintiffs' legal arguments. Because C.R. England did not avail itself of the opportunity to submit any contrary evidence disputing Plaintiff's evidence in support of its Motion, the court does not believe it would be in the interest of justice to prolong this issue by holding an evidentiary hearing.

The standard for summary judgment under Rule 56 is well known. *See United States v. Simons*, 129 F.3d 1386, 1388–89 (10th Cir.1997) (Where a movant has met the initial burden required to support summary judgment, the non-movant then "must either establish the existence of a triable issue of fact under Fed.R.Civ.P. 56(e) or explain why he cannot ... under Rule 56(f)")(quoting *Pasternak v. Lear Petroleum Exploration*, 790 F.2d 828, 832 (10th Cir.1986)). In this case, C.R. England having failed to oppose the facts presented by Plaintiffs, those facts are deemed conceded.

### 3. Undisputed Facts

In so far as C.R. England seeks arbitration under either the FAA or the UAA, the undisputed evidence shows the following: The arbitration clause at issue in the present case provides that the arbitration will be conducted under the rules of the American Arbitration Association. Those rules provide for the splitting of the arbitrator's fees. There is a $500 filing fee and then the parties split the arbitrator's fee of approximately $250 per hour, plus fees for hearing rooms, court reporters, and the like. In contrast, Plaintiffs' claims are relatively small, usually around $3,000. Plaintiffs' work as truck drivers necessarily takes them all over the country and they spend an average of 210 nights a year on the road. None of the Plaintiffs reside in Utah. Their incomes average around $36,652 per year. The company withholds their funds pending dispute resolution. The costs of arbitration and the relatively small amount of the claims effectively deter use of the arbitration to vindicate statutory rights. The process is so deterring that only two of C.R. England's drivers have ever pursued arbitration.

The undisputed evidence also shows that C.R. England refers or sells all of its claims against its former drivers to collection agencies. C.R. England claims that it does not have full information yet on all of the lawsuits resulting from selling or referring its claims. However, the information it has provided shows that while some were filed in C.R. England's name, most often the lawsuits against the drivers were filed in the name of the various collection agencies.

Stunningly, for a litigant who is seeking to enforce what it claims is a "clear and definite provision requiring the parties to submit any dispute 'arising under,' 'out of,' 'relating to,' or requiring the 'interpretation' of the"[2] Operating Agreements to

---

2. Def.'s Br. in Support of Mot. to Stay and Compel Arbitration, at 2.

arbitration, C.R. England has not submitted a single one of its 2,591 claims under the Operating Agreements to arbitration.

#### 4. Case Law

At one time in this Circuit, a requirement that a litigant pay one-half of arbitration costs was, by itself, sufficient to find that an arbitration agreement failed to provide an accessible forum in which a litigant could resolve his statutory rights. *See Shankle v. B–G Maintenance Management,* 163 F.3d 1230 (10th Cir.1999). However, *Shankle's* holding has been modified by the U.S. Supreme Court's ruling in *Green Tree Financial Corporation–Alabama v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). In *Green Tree,* the Court adopted a case-by-case approach to determining whether a cost-splitting provision in an arbitration agreement. denies potential litigants the opportunity to vindicate their statutory rights. It held that parties seeking to show that arbitration would be prohibitively expensive bear the burden of showing the likelihood of incurring such costs. The Court found it unnecessary to determine how detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence because there had been no evidence in that case and, therefore, the risk was deemed too speculative.

However, the case law since then has fleshed out what is required. For example, in *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646 (6th Cir.2003), the Sixth Circuit held:

> Potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum. Our approach ... look[s] to the possible chilling effect of the cost-split-

ting provision on similarly situated potential litigants, as opposed to its effect merely on the actual plaintiff in any given case.

\* \* \* \* \* \*

> In conducting this analysis, the reviewing court should define the class of such similarly situated potential litigants by job description and socioeconomic background. It should take the actual plaintiff's income and resources as representative of this larger class's ability to shoulder the costs of arbitration. But, as one court has noted, *Green Tree* does not necessarily mandate a searching inquiry into an employee's bills and expenses.

*Id.* at 664.

#### 5. Conclusion

Based on the undisputed facts, the court finds that Plaintiffs have met their burden and shown that in this case the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in an arbitral forum. The Court further finds that C.R. England's Motion to Stay and Compel Arbitration should be denied because Plaintiffs cannot effectively vindicate their federal statutory rights in the arbitral forum.

### E. Unconscionability

■ Prior to the Third Circuit's ruling in *Palcko,* the court's bench ruling did not address Plaintiffs' arguments regarding unconscionability. However, the issue was fully briefed and the court will do so now. Based upon the same undisputed facts that support the finding that the arbitration forum fails to provide Plaintiffs an effective and accessible forum to vindicate statutory claims, the court finds that enforcing

the arbitration clause would be unconscionable.

■ Under Utah law:

A party claiming unconscionability bears a heavy burden. The law enables parties to freely contract, establishing terms and allocating risks between them. The law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party. However, "this general principle has its limits .... If a contract is unconscionable, in whole or in part, the court may, on equitable grounds, refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result." [*Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996).] Unconscionability, while defying precise definition, " 'has generally been recognized to include an absence of meaningful choice on the part of one of the parties *together with contract terms which are unreasonably favorable to the other party.*' " *Resource Management Co.*, 706 P.2d at 1043.

In determining whether a contract is unconscionable, we use a two-pronged analysis. *See Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996). The first prong—substantive unconscionability—focuses on the agreement's contents. The second prong—procedural unconscionability—focuses on the formation of the agreement. *See id.* Our consideration of whether a contract provision is unconscionable is made "in light of the twofold purpose of the doctrine, prevention of oppression and unfair surprise." *Resource Management*, 706 P.2d at 1041. We have acknowledged that substantive unconscionability alone may support a finding of unconscionability but that procedural unconscionability without any substantive imbalance will rarely render a contract unconscionable. *See Sosa*, 924 P.2d at 361.

\* \* \* \* \* \*

■ Substantive unconscionability focuses on "the contents of an agreement, examining the 'relative fairness of the obligations assumed.' " *Id. (quoting Resource Management*, 706 P.2d at 1043). In determining substantive unconscionability, we consider whether a contract's terms are "so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain ... according to the mores and business practices of the time and place." *Id.* Even if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable—the terms must be "so one-sided as to oppress ... an innocent party." *Id.*

*Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402–03 (Utah 1998) (italicized emphasis in original; internal quotations and citations partially omitted).

In the present case, the court finds substantive unconscionability. The terms of the Operating Agreements are "so one-sided as to oppress or unfairly surprise an innocent party" and "there exists an overall imbalance in the obligations and rights imposed by the bargain ... according to the mores and business practices of the time and place." *Id.* They allow C.R. England to act unfettered by any requirement to arbitrate. Among other things, it is able to exercise control over disputed funds, bring any legal actions it deems necessary regarding its claimed property, and to sell or refer all of its claims against the drivers rather than submit a single one to arbitration. In stark contrast, the Operating Agreements purport to bind the drivers to submit any and all disputes to an expensive arbitration proceeding in a

distant and inconvenient forum. In short, the Operating Agreement is so overwhelmingly favorable to C.R. England that it is effective only *against* the drivers. Accordingly, the court finds that the arbitration agreements are not enforceable as substantively unconscionable.

### F. Conclusion

For all of the above reasons, the Court will deny C.R. England's Motion to Stay and Compel Arbitration and Grants Plaintiffs' Motion for Partial Summary Judgment as to Arbitration and will not compel arbitration.

### IV. DEFENDANT'S MOTION TO DISMISS

C.R. England moves to dismiss [3] pursuant to Fed.R.Civ.P. 12(b)(6), for the following four reasons: first, because under 49 U.S.C. § 14704(a)(1), Plaintiffs were required to obtain an administrative order from the Secretary of the Department of Transportation prior to filing this action; second, because there is no private right to sue for damages for violations of the federal regulations; third, because a two-year statute of limitations should apply and therefore Plaintiffs' claims outside of that two-year period are time barred; and finally, fourth, the Court should stay this action pending a ruling by the Federal Motor Carrier Safety Administration, FMCSA, on the proper legal standard to apply.

The standard for considering a Fed.R.Civ.P. 12(b)(6) motion is as follows:

> [A]ll well-pleaded factual allegations in the amended complaint are accepted as true and viewed in the light most favorable to the nonmoving party. *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997).

"A 12(b)(6) motion should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz,* 948 F.2d 1562, 1565 (10th Cir. 1991).

*Sutton v. Utah State School for the Deaf and Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999).

 The issue of whether 49 U.S.C. § 14704 creates a private right of action for injunctive relief and damages for violations of the federal Truth–in–Leasing Regulations was exhaustively examined in the Eighth Circuit case of *Owner–Operator Independent Drivers Association v. New Prime, Inc.,* 192 F.3d 778 (8th Cir.1999). The Court finds the *New Prime* case to be well-reasoned and persuasive. Accordingly, the Court will follow *New Prime* and hold that Plaintiffs were not required to obtain an administrative order prior to instituting suit; that there is a private right to sue; and that, in the absence of any indication from the FMCSA that it is willing to undertake decisions on the matters before this Court, the Court will not defer to it under the primary jurisdiction theory.

 On the issue of the statute of limitations, the Court declines C.R. England's invitation to follow the courts that have, in effect, rewritten the statute—49 U.S.C. § 14704—based on a supposed "scrivener's

---

**3.** Having carefully reviewed all of the briefs, case law, and materials submitted in connection with the Motion the court determined that further argument on these purely legal issues would not be helpful.

error." The Court finds that the imposition of the two-year statute of limitations for one category of claims while retaining the general four-year federal statutes of limitations for the type of claims at issue in this case was a reasoned choice by Congress and the Court will not attempt to rewrite the statute. In so holding, the Court declines to follow *Fitzpatrick v. Morgan Southern, Inc.*, 261 F.Supp.2d 978 (W.D.Tenn.2003), and instead will follow the cases, such as *Owner–Operator Independent Drivers Association, Inc. v. Ledar Transp.*, No. 00–258 (W.D.Mo. Jan. 7, 2004) and *Owner–Operator Independent Drivers Association, Inc. v. Heartland Express, Inc.*, No. 3–01–CV–90179 (S.D. Iowa filed Feb. 3, 2003) that apply the four-year statute of limitations set forth at 28 U.S.C. § 1658. *See also Owner–Operator Independent Drivers Ass'n, Inc. v. Bulkmatic Transport Co.*, 2004 WL 1151555, *4 (N.D.Ill. May 3, 2004) (declining to examine legislative history and asserting that "scrivener's error" argument is "inapt" where § 14704 is unambiguous).

The Court finds that the Plaintiffs' claims are governed by the four-year statute of limitations set forth at 28 U.S.C. § 1658 and therefore are not time-barred.

C.R. England has failed to establish that the Complaint should be dismissed under Fed.R.Civ.P. 12(b)(6). Accordingly, the court will deny the Motion to Dismiss.

## V. CONCLUSION AND ORDER

Accordingly, for the reasons stated above, it is therefore

ORDERED that Defendant's Motion to Stay and Compel Arbitration is DENIED. It is further

ORDERED that Plaintiffs' Cross–Motion for Summary Judgment on the Arbitration Defense is GRANTED. It is further

ORDERED that Defendants' Motion to Dismiss is DENIED. It is further

ORDERED that Defendant's Motion to Stay Argument and Decision on Defendant's Motion to Dismiss is DENIED as moot. It is further

ORDERED that within ten days following entry of this Order, the parties shall contact the Magistrate Judge assigned to this case for purposes of requesting a scheduling conference to set discovery deadlines and a trial date.